UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| David M. Clapper, | ) | Case No. 5:09CV569 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | [Resolves Docs. 260, 261, 262] |
| Clark Development, Inc., et al., | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendants. | ) | AND ORDER |

This matter is before the Court upon three motions for summary judgment. Docs. 260, 261, and 262). Plaintiff David Clapper moved for partial summary judgment against the Estate of Karen Clark and Melvin Clark, Sr. Doc. 261. Clapper also moved for summary judgment against Clark Development, Inc. ("CDI") and Mikar, Ltd. Doc. 260. Finally, Melvin Clark, Sr. moved for summary judgment. Doc. 262. The Court resolves these motions as detailed herein.

**I.     Facts**

Ordinarily, the Court would now engage in some discussion of the procedural history of the instant matter. However, such a summary is not possible in this matter for several reasons. First, the procedural history herein is nothing short of nightmarish. A matter that started out as simple as an assertion that a loan went unpaid quickly devolved into the current docket with nearly 300 pleadings and events. Interested parties were added to facilitate a foreclosure aspect of the case. Two different receivers have been engaged to protect the properties at issue. Non-parties have appeared before the Court due to interference with the receivers. One defendant has passed away and had her estate substituted. Currently, three separate motions for summary judgment are ripe for consideration.

1

The Court was hopeful that it would also have the ability to lay out some basic background on which the parties could agree. However, the often convoluted and difficult to follow briefing has only followed the path laid out early on in this matter. The parties agree on nothing. Their arguments are often non-responsive to one another, leaving the Court to sift through all the documentation and attempt to make heads or tails of it. The Court will now so endeavor.

## II. Legal Standard for Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(a). The initial burden of showing the absence of any "genuine issues" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed.R. Civ.P. 56(c)).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. (quoting former Fed.R. Civ.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id*. at 252. Moreover, the Court must view a summary judgment motion "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995). Moreover, Fed.R. Civ.P. 56(e) states as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> …

2

> (2) consider the fact undisputed for purposes of the motion; [or]
>
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]

Accordingly, summary judgment analysis asks whether a trial is necessary and therefore is appropriate when there are no genuine issues of fact. *Anderson,* 477 U.S. at 250.

### III. Legal Analysis

#### A. Clapper's claims against CDI and Mikar

In his motion for summary judgment against CDI and Mikar, Clapper makes a relatively straightforward argument. Clapper contends that he loaned $120,000 to various entities that were in some manner related to Karen Clark or David Bruno. On June 18, 2003, Clapper loaned $25,000 to Akron Donuts. On July 9, 2004, Clapper loaned $75,000 to Bruno. On November 7, 2005, Clapper loaned $20,000 to Sterling China. Clapper also contends that each of these loans was later subsumed by an open-ended promissory note that was executed by Karen Clark on behalf of Mikar on November 3, 2005. Clapper also asserts that this note was later collateralized by a mortgage on CDI properties. Finally, Clapper concludes that he never received any form of payment on the loans at any time.

The sole opposition to these claims appears to rely exclusively on the declaration of Bruno. Within that declaration, Bruno admits that Clapper loaned $25,000 to Akron Donuts. Bruno also admits that Clapper and Clark later turned that investment into a loan. Doc. 277-1 at 1. Bruno, however, disputes the nature of Clapper's other payments. First, Bruno alleges that Clapper wired him $75,000 on July 9, 2004 – verifying Clapper's allegation. Bruno, however, asserts that Clapper received $150,000 in collateral for this loan *and* agreed to pay an additional $75,000 to a law firm. The promissory note referenced by Bruno, however, makes no mention of any kind of this agreement to pay an additional amount.

3

With respect to Clapper's final payment, Bruno's declaration contains the following:

> On or about November 7, 2005, Clapper wired an additional $20,000 to Sterling China as an inducement to me to exchange receivables with him. Clapper had at this point receivables from Sterling China, Akron Doughnuts and me, and I had receivables from Mikar. Clapper was owed a total of approximately $130,000 from Sterling China, Akron Doughnuts and myself, consisting of $120,000 in principal and approximately $10,000 in interest and legal fees.
>
> On or about November 4, 2005, Clapper assigned to me his rights to the receivables from Sterling China, Akron Doughnuts and myself in exchange for my assignment to Clapper of my rights to repayment from Mikar for $205,000 out of the loans and investments I had made. The agreement is attached hereto as Exhibit "2".

Doc. 277-1 at 2. Exhibit 2, however, reflects no such agreement. Instead, Exhibit 2 is nothing more than a personal guaranty from Bruno to Clapper for the $205,000 open-ended note that is at the heart of this litigation.

On the face of the conflicting declarations, it would appear that summary judgment is not appropriate in this matter. Clapper and Bruno paint vastly different pictures of advanced monies, their purposes, and the documents that underlie the transactions. However, Bruno's declaration flies in the face of *all* of the documentary evidence before the Court. Accordingly, it does not create a *genuine* issue of material fact.

As noted above, Bruno's claim that Clapper promised to pay an additional $75,000 to a law firm on behalf of Sterling China is not contained within the promissory note referenced by Bruno. Similarly, Bruno completely misconstrues the personal guaranty he signed in an attempt to somehow turn it into an asset-swap agreement.

The Court, however, need not look beyond the undisputed evidence. There is no dispute that Clapper loaned out $120,000. Furthermore, Karen Clark's deposition concedes that the November 3, 2005 open-ended note reflected the payments that Clapper had made that totaled $120,000. No evidence, even from Bruno, has been offered to dispute this fact. In addition, while

4

Bruno appears to argue that the November 3, 2005 note is not the "operative note" that Clapper should be pursuing, the documentary evidence also refutes this contention.

Emails involving Bruno were sent and received on the morning of November 3, 2005. The first email informs Bruno that the note and mortgage are ready to be filed and was sent at 9:16 a.m. on November 3, 2005. Doc. 280-2 at 6. Inquiry is then made about the amount of money that Clapper is owed. At 11:24 a.m. that same day, Bruno responds that Clapper is owed:

> $25,000 (from Clapper to Karen Clark), add $3,800 in interest.
>
> $75,000 (from Clapper to Sterling China USA LLC), add $4,175 interest.
>
> $25,000 (from Clapper to _____, for this funding), add $500 interest.
>
> ….
>
> I sent an executed Note and Mortgage to Pete yesterday by overnight mail. Karen Clark can file an executed Note and Mortgage TODAY – but needs direction. BOTH Karen or I are Managing Members for Mikar LTD, and EITHER Karen or I can sign for the LLC.

Doc. 280-2 at 6. Bruno is then informed that Clapper only agreed to front an additional $20,000, not $25,000 as reflected in Bruno's email. Doc. 280-2 at 5. Bruno then responds "I will also sign a personal guarantee." Doc. 280-2 at 5.

This email correspondence refutes any and all contentions by Bruno that Clapper's prior loans are not reflected in the November 3, 2005 note. Moreover, the email destroys any notion that Bruno's personal guaranty was some sort of asset-swap agreement. In short, the contemporaneous, documentary evidence that contains Bruno's email signature supports each and every assertion made by Clapper. Accordingly, there is not a genuine issue of material fact on these claims.

As against Mikar, judgment on the note is GRANTED. Judgment in the amount of $413,448.59 is hereby entered in favor of Clapper against Mikar. The Court notes that this amount includes interest and attorney fees as contemplated by the note. Moreover, the amounts alleged in support of summary judgment have not been contested.

5

With respect to CDI, the Court also finds that judgment is appropriate. Karen Clark admitted in her deposition that CDI put up property as collateral for the original loan. That is, Clark admitted that the original mortgage of Mikar property was transferred over to a mortgage on CDI property. There is no genuine issue of fact surrounding this mortgage. Further, within the mortgage, CDI assumes liability for any deficiency following a foreclosure. As the facts of this matter make clear, following foreclosure of the condominium units, there will be no funds left to pay Clapper. Accordingly, judgment in the amount of the deficiency against CDI in the amount of $413,448.59 is also proper.[1] If in some manner the full foreclosure results in a payment to Clapper, this amount will be properly reduced.

Clapper's motion for partial summary judgment against CDI and summary judgment against Mikar (Doc. 260) is GRANTED.

B. Clapper's Claims Against Melvin Clark, Sr.

Melvin Clark has moved for summary judgment on the four claims against him. While the Court will separately analyze each claim, there is one common legal question that the Court must resolve – namely, was Melvin Clark an officer or shareholder of CDI? The sole, admissible evidence requires the Court to answer that question in the negative.

In his sworn declaration, Melvin Clark states that he was never at any time an officer or shareholder of CDI. The sole evidence relied upon by Clapper to dispute this fact is Karen Clark's answer to an interrogatory on behalf of CDI. Within that answer, Karen Clark includes Melvin Clark as an officer of CDI. Unfortunately for Clapper, this answer to an interrogatory is not admissible against Melvin Clark.

In that respect, the Court agrees with the non-binding authority relied upon by Melvin Clark. "[I]nterrogatory answers may not be used against any party who is not the party answering the

---

[1] Due to what appears to be a pending bankruptcy for CDI, the Court will not formally enter judgment against CDI at this time.

6

interrogatory." *Goodwin v. CSX Transportation, Inc.*, 2010 WL 3190745, at *3 (W.D.Ky. Aug. 11, 2010) (citation omitted). "A mere ex parte statement in an answer to an interrogatory is admissible against the party answering the interrogatory, but it is not admissible in evidence against anyone else, especially as the person giving the answer is not subject to cross-examination." *Stottlemire v. Cawood*, 213 F.Supp. 897, 899 (D.D.C. 1963). The Court agrees. The statements made by Karen Clark on behalf of CDI are not admissible against Melvin Clark. Throughout this litigation, Clapper had ample opportunity to ask Melvin Clark directly whether he was an officer or shareholder of CDI. He apparently failed to ask such a question. Melvin Clark could not cross-examine or challenge the validity of the answer to the interrogatory. Furthermore, as introduced against him, the answer would be hearsay. Clapper has failed to identify any exception to the hearsay rule that would allow its introduction. Moreover, while Clapper has highlighted that Rule 56 allows for the use of answers to interrogatories, he has offered no authority to suggest that such an inclusion somehow negates the Rules of Evidence. The answer of CDI to an interrogatory has not been shown to be admissible against Melvin Clark. Accordingly, there is no genuine issue of material fact with respect to Melvin Clark's position with CDI – he had none.

Count five of the amended complaint claims that Melvin Clark, Karen Clark, and CDI violated Ohio's Uniform Fraudulent Transfer Act. Clapper appears to concede that his claim is premised on Revised Code § 1336.04(A)(1). § 1336.04(A)(1) provides that a transfer made or an obligation incurred by a debtor is fraudulent if the debtor made the transfer or incurred the obligation with an actual intent to hinder, delay, or defraud any creditor of the debtor.

In his discovery responses and declarations, Melvin Clark alleges that each payment he received from CDI was a reimbursement for expenses he incurred on behalf of CDI. Many of these claims are directly supported by the affidavit of Karen Clark. Clapper has been unable to dispute the validity of any of these facts. Instead, Clapper points to the total amount received by Melvin

7

Clark, Karen Clark, Melvin Clark's son, grandson, and granddaughter. However, these amounts would only be relevant as to Melvin Clark if it were found that he was an officer or shareholder of CDI. Having concluded above that he is not an officer or shareholder, solely those payments made directly to Melvin Clark, Sr. are relevant. As there is no evidence whatsoever that these payments satisfy the "intent to hinder, delay, or defraud" standard, Melvin Clark is entitled to summary judgment on this claim of the amended complaint.

Count six in the complaint alleges alter ego liability against Melvin Clark. Count seven alleges fraudulent inducement against Melvin Clark. Count eight alleges successor liability against Melvin Clark. As will be briefly explained below, each of these claims is dependent upon a finding that Melvin Clark was an officer or shareholder of CDI.

The alter ego liability claim is simply an argument to pierce the corporate veil of CDI. Having found that Melvin Clark is not an officer or shareholder of CDI, piercing the veil would not lead to liability against him. Accordingly, Melvin Clark is entitled to judgment on this claim.

The fraudulent inducement claim against Melvin Clark again relates solely to liability that would flow based upon a position held at CDI. Melvin Clark never had any direct dealings with Clapper. Accordingly, even if a valid fraudulent inducement claim existed, it would not result in liability against Melvin Clark.

Finally, Clapper alleges successor liability against Melvin Clark. Clapper contends that CDI continued to operate following cancellation of its right to transact business. However, successor liability is likewise dependent upon a finding that Melvin Clark was an officer or shareholder of CDI.

Accordingly, Melvin Clark's motion for summary judgment (Doc. 262) is GRANTED.

C.  Clapper's Claims Against the Estate of Karen Clark

Clapper's claims against the Estate of Karen Clark all revolve around piercing the corporate veil.  To that extent, Clapper only seeks summary judgment on his alter ego claim (count six of the amended complaint).  In support of this argument, Clapper asserts that Karen Clark routinely disregarded corporate formalities and often used the funds of CDI for her own personal expenses.  The Court will review those contentions below.

Generally, in order to disregard the protections afforded by corporate or limited liability business forms, one must show "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 2751 (Ohio 1993).  "When a shareholder exercises such control over a corporation that the corporation becomes the shareholder's alter ego, and when the shareholder misuses his control of a corporation to commit specific, egregious acts that injure a third party, then it is unjust to allow the shareholder to use the corporate form as a shield to escape the consequences of those wrongful acts." *Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 467 (Ohio 2009) (citing *Belvedere*, 67 Ohio St.3d at 289).

In his motion, Clapper presents substantial evidence that Karen Clark financed her own lifestyle and paid for many items for her children through the funds of CDI.  Karen Clark purchased sporting goods, made payments on her BMW, paid her medical expenses and those of her children, made payments to her brother, made tuition payments for her children, and paid cell phone bills for

9

her immediate family all with CDI funds.[2] In response, her Estate has made no assertion that these were legitimate business expenses incurred by CDI. Instead, the response only serves to make clear that CDI was Karen Clark's alter ego. Corporate formalities were apparently rarely, if ever observed. Following document requests, it was revealed that CDI kept almost no corporate documents, nor is there any indication that board meetings or other formalities ever occurred.

Rather than challenge whether CDI was Karen Clark's alter ego, the Estate simply asserts that Clark committed no fraudulent act against Clapper and that the Estate's beneficiaries should therefore not be "punished" in some manner. In that manner, the Court finds instructive *Barbee Concrete Constr. V. Bachinski Builders, Inc.*, 1997 WL 723195, at *4 (Ohio Ct. App. Nov. 20, 1997). In *Barbee Concrete*, the Ohio appellate court upheld piercing the corporate veil based upon a trial court finding as follows:

> Addressing the second and third prongs of the *Belvedere* test together, the trial court found that during 1993, Laverne Bachinski caused Bachinski Builders to make a series of fraudulent transfers of corporate funds to members of the Bachinski family, which transfers resulted in the corporation being unable to pay Barbee Construction for its services.

*Id.* at *2. While Clapper's fraudulent transfer claim against the Estate of Karen Clark is not presently before the Court, the same analysis applies to piercing the corporate veil. Thus, a review of the "badges of fraud" contained in Revised Code § 1336.04(B) is appropriate. As noted above, under Ohio law, a transfer may be deemed fraudulent under Revised Code § 1336.04(A)(1) which provides:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

---

[2] This is just a short list of the payments Clark made using CDI funds. Clapper also contends that funds were sent to Karen Clark's mother, that funds were used to purchase jewelry, that funds were used to pay personal credit cards, and that funds paid Karen Clark's rental, mortgages, and beach club dues.

10

Subsection (B)(1) then provides as follows:

> (B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:
>
> (1) Whether the transfer or obligation was to an insider;
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
>
> (3) Whether the transfer or obligation was disclosed or concealed;
>
> (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) Whether the transfer was of substantially all of the assets of the debtor;
>
> (6) Whether the debtor absconded;
>
> (7) Whether the debtor removed or concealed assets;
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;
>
> (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Revised Code §1336.04(B).

Payments were made on numerous occasions directly to Karen Clark and/or her family members. Therefore, payments were made to insiders. To some extent, it is clear that Karen Clark maintained control over the transfers as she directed them to pay personal expenses of herself and her family. The transfers, totaling over $91,000, were also a substantial portion of CDI's assets, ultimately contributing to its bankruptcy. It is also clear that suit had been threatened by Clapper before many of the transfers were made.

Given the presence of these badges of fraud, along with the fact that corporate formalities were routinely ignored and that Karen Clark routinely utilized CDI as her own personal ATM, there is no genuine issue of material fact remaining on Clapper's alter ego claim.  Clapper's motion for summary judgment on this claim (Doc. 261) is GRANTED IN PART AND DENIED IN PART.  The Estate of Karen Clark is hereby liable for the debt of CDI to Clapper in the amount of $413,448.59.  To the extent the motion seeks relief against Melvin Clark, the motion is DENIED for the reasons stated above.

## IV. Conclusion

Clapper's motion for summary judgment (Doc. 260) against Mikar and CDI is GRANTED.  Melvin Clark's motion for summary judgment (Doc. 262) is GRANTED.  Clapper's motion for summary judgment (Doc. 261) against the Estate of Karen Clark and Melvin Clark is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.


DATED: March 6, 2012                    /s/  John  R.  Adams
                                        JOHN R. ADAMS
                                        UNITED STATES DISTRICT JUDGE